

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EJD:IC
F. #2025R00171

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 22, 2025

By ECF

The Honorable Vera M. Scanlon
Chief United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    United States v. Jonah Luc
                  Miscellaneous Docket No. 25-253 (VMS)

Dear Chief Judge Scanlon:

      The government respectfully submits this letter in support of its application for the entry of a permanent order of detention pending trial as to defendant Jonah Luc. The defendant is associated with a violent street gang—the Insane Crip Gangsters ("ICG")—in Brooklyn, New York. As further described below, ICG is a street gang that commits shootings and other acts of violence against rival gang members throughout Brooklyn. To fund their crimes and the organization, ICG members and associates engage in drug trafficking and "scamming," or various fraud crimes. The defendant is charged by criminal complaint with one such "scamming" crime, namely, the theft of government funds and aggravated identity theft in connection with stealing a United States Treasury check. For the reasons set forth more fully below, the government submits that the defendant is both a flight risk and a danger to the community, and no combination of conditions can secure his appearance at trial and the safety of the community.[1]

I.      The Defendant's Gang Affiliation and Participation in a Homicide

      ICG, a nationwide street gang, that operates in and around Brooklyn, New York, among other locations. The chapter of ICG in Brooklyn is also referred to as ICG Babiez. ICG originated in Long Beach, California and specifically, on 23rd Street. The number "23" is a reference to ICG's origin street and block, and members and affiliates of the gang often use the number "23" to promote or reference ICG. Members and affiliates of ICG sometimes also signify their membership and allegiance to the gang by wearing the colors blue, black and grey,

---

[1]     The government moves for a detention hearing as this case involves a serious risk that the defendant will flee, as detailed within this memorandum. See 18 U.S.C. § 3142(f)(2)(A).

or using special hand signals that reference "2" or "3." The defendant has publicly touted his ICG affiliation on various social media accounts, by referencing "23;" for example, in a July 9, 2024 story, the defendant posted a photograph depicting candles arranged to write "23KB." In the post, the defendant used "23," to reference the origin block of ICG, 23rd Street, and "KB" to reference Kaylon Baugh, a former ICG Babiez member who was killed on July 4, 2024. Moreover, the defendant and other ICG members and associates have posted photographs, stories and videos showing them together and promoting the gang through references to "23" or "Babiez."

ICG members meet regularly and are expected to contribute to a fund intended to be distributed to ICG members who are incarcerated. To financially support fellow gang members, members and associates of ICG engage in various types of fraud and traffic drugs such as cocaine, marijuana and synthetic marijuana. ICG members and associates also commit various acts of violence, including murder, attempted murder and assault, to protect their territory and promote the gang. Specifically, members and associates of ICG have been involved in violent acts against, or intended for, members of the 8 Trey Crips set, also based in Brooklyn, New York. The pattern of retaliatory violence has led to gang-related shootings that have plagued the Crown Heights and Flatbush neighborhoods in Brooklyn, among others, between 2019 and the present.

The defendant was involved in a March 31, 2022 shooting that killed a twelve-year-old boy and injured another bystander. On March 31, 2022, the defendant and three other individuals were in a car that fired multiple gunshots into a parked car in the East Flatbush neighborhood. Surveillance footage reflected that the defendant wore a dark puffer jacket with a grey sweatshirt inside throughout the day, as depicted below from surveillance footage stills from approximately 3:36 p.m. (left) and 6:21 p.m. (right) on March 31, 2022.

 

As captured on surveillance footage, at approximately 6:47 p.m., the defendant exited a residential apartment building in Crown Heights, known to be a location used and frequented by ICG members and associates, with another individual ("CC-1") and walked towards a black Mercedes Benz sedan parked in the vicinity of the building. The defendant entered the car on the front passenger side while CC-1 entered on the front driver's side of the car. Two other individuals ("CC-2" and "CC-3") then entered the back seats of the car. As captured on surveillance footage, the Mercedes Benz then left the area and drove eastbound. At or around 7:37 p.m., the Mercedes Benz turned onto East 56th Street near the intersection of East 56th Street and Linden Boulevard, and multiple shots were fired from the sunroof and driver's side of

the Mercedes Benz into a sedan on the side of the road. A twelve-year-old boy sitting in the front passenger seat of the car was struck in the head and died from his injuries. A woman sitting in the front driver's seat was struck by multiple gunshots, but survived her injuries. An eight-year-old girl sitting in the back seat of the parked sedan was unharmed.

After the shooting, the Mercedes Benz was captured on surveillance footage driving away from the scene and parked in the Prospect Lefferts Garden neighborhood of Brooklyn at approximately 7:50 p.m. The defendant and his co-conspirators got out of the car, were then picked up by a white sedan, and, at or around 8:31 p.m., the white sedan delivered the defendant, CC-1, CC-2 and CC-3 to the same Crown Heights apartment building from which they departed earlier in the evening.

The defendant has admitted to law enforcement that he was present inside the Mercedes Benz at the time of the above-described murder.

II.     The Defendant's April 28, 2023 Conviction

On October 28, 2022, law enforcement officers in Edison, New Jersey responded to a call from a local Home Depot location, reporting that two minors were stealing electronics from the store. Responding officers observed the two minors running out of the store into the parking lot towards a running, parked black Honda CR-V, with the defendant in the driver's seat. When the two minors observed law enforcement officers, they both dropped the merchandise fled from the parking lot.

Officers approached the defendant in the driver's seat to place him under arrest. After the defendant stepped out of the car, he refused to be placed into handcuffs and pushed an arresting officer down. The defendant then fled on foot from the parking lot and store but was ultimately apprehended and arrested. Both of the minors who fled were also arrested and determined to be fourteen years old.

The defendant, who was twenty-one years old at the time, was charged with robbery by force, aggravated assault and employing juveniles in the commission of a crime, among other charges. On April 28, 2023, the defendant pleaded guilty to conspiracy to engage in a crime, in violation of New Jersey Criminal Code 2C:5-2A(1) and shoplifting, in violation of New Jersey Criminal Code 2C:20-11B(1) in the Superior Court of New Jersey, Middlesex County, and was sentenced to a term of probation of three years.

III.    The Charged Offense and the Defendant's Other Criminal Activity While on Probation

Despite being on probation, the defendant has continued to promote and engage in criminal activity as evidenced in his social media posts, which show him with firearms and soliciting co-conspirators for "scamming" crimes, among other things. For example, on July 11, 2024, the defendant posted a story of himself and another masked individual holding handguns, as depicted below. Notably, the firearm in the defendant's hand has a blue laser sight, and he is pointing the barrel of the gun towards the camera.



In addition, the defendant routinely posts stories, photographs and videos soliciting co-conspirators with open bank accounts at different financial institutions such as Chase Bank, Citi, TD Bank, Bank of America and Capital One, among others, to participate in financial fraud. A sampling of the defendant's posts are shown in the below screenshots captured on March 22, 2025 (left), August 5, 2025 (middle) and August 21, 2025 (right), respectively.





Co-conspirators' bank accounts are used in different "scamming" schemes in various ways. Co-conspirators' account information with specific banks are solicited and used when a particular bank has a glitch or loophole that "scammers" use to steal money from the bank—for example, from time to time, a bank's ATM software may have a temporary glitch that allows those with a debit card from that bank to withdraw cash without regard to the amount deposited in the account. Co-conspirators' existing accounts are also used to deposit fraudulent or stolen checks or criminal proceeds in the co-conspirator's account and the "scammers" withdraw cash, thereby converting stolen or fraudulently obtained checks or funds into cash. These co-conspirators typically then receive a portion of the proceeds as a fee for providing their account information. By carrying out these "scamming" schemes, the defendant, and ICG members and associates generally, can obtain thousands of dollars in a single transaction, which in turn are used to fund the gang's activities and promote and enrich gang members. The defendant is charged with one such "scamming" scheme involving the deposit of a stolen check in a co-conspirator's Capital One bank account.

The defendant is charged by criminal complaint with theft of government funds and aggravated identity theft, in connection with a stolen United States Treasury check payable to an individual identified as John Doe in the complaint. See ECF No. 1. On August 21, 2025, the defendant's residence was searched pursuant to the search condition of his probation. The defendant's probation officer recovered a stolen United States Treasury check payable to John Doe who confirmed that he did not give the defendant or anyone else authorization to possess the check nor deposit the check; nevertheless, the check was deposited on July 31, 2025 in a Capital One bank account. When asked about the check, the defendant first told his probation officer that it was a friend's check and that the friend had given him the check. The defendant later changed his account and told the probation officer he found it on the ground outside.

The probation officer also recovered two credit cards that were not in the defendant's name on a nightstand in the defendant's bedroom. The probation officer asked the defendant about the credit cards and the defendant told the officer that he was given the credit cards by two friends. When asked to tell the probation officer the names of the two friends, the defendant could not provide any names. Moreover, when the probation officer attempted to search the defendant's cell phone pursuant to the defendant's conditions of probation, the defendant refused to open his cell phone for the officer and defied the officer's orders and the conditions of his probation.

IV.     Legal Standard and Procedure

The Bail Reform Act of 1984, codified at 18 U.S.C. §§ 3141-3156, "requires that an accused be detained pending trial where, following a hearing in accordance with § 3142(f), 'the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" United States v. English, 629 F.3d 311, 318 (2d Cir. 2011) (quoting 18 U.S.C. § 3142(e)(1)). While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).  When a finding of dangerousness is related to violent conduct, it need not be shown that the defendant personally engaged in violence.  United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985).

Four factors guide the Court's determination of whether a defendant should be released on bail:

(1) "the nature and circumstances of the offense charged,";

(2) "the weight of the evidence against the person";

(3) "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and] criminal history, and record concerning appearance at court proceedings"; and

(4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).

Evidentiary rules do not apply at detention hearings, and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000).  In the pre-trial context, few detention hearings involve live testimony or cross-examination.  Most proceed on proffers.  Id. at 131.  This is because bail hearings are "typically informal affairs, not substitutes for trial or even for discovery."  Id. (internal quotation marks omitted).  The Second Circuit has reversed district courts where they have not credited the government's proffer, including proffers with respect to a defendant's dangerousness.  See, e.g., United States v. Mercedes, 254 F.3d 433, 437 (2d Cir. 2001) ("[The defendant] has twice been convicted of weapon possession – one felony conviction, and one misdemeanor conviction.  We find the district court committed clear error in failing to credit the government's proffer with respect to [the defendant's] dangerousness.").

IV. Argument

No bail package will protect the community from the danger posed by the defendant.  Here, the factors set forth in Section 3142(g) militate in favor of the defendant's pretrial detention, and, as the defendant poses a danger to the community and a risk of flight, he therefore should be detained.

  A.  <u>The Defendant Poses a Danger to the Community</u>

  First, the defendant has shown a commitment to engage in criminal conduct even when under court supervision and subject to probationary conditions. As described above, while on probation, the defendant has associated himself with firearms and posted a story showing him holding a firearm with a laser sight even though one of his conditions of probation prohibits the possession of a firearm or dangerous weapon. Moreover, the defendant has continued to "scam" or engage in fraud schemes and post on social media to solicit co-conspirators to join him in committing fraud—in flagrant disregard of his probation conditions. Although the charges here are non-violent, it is well-established that defendants pose a danger to the community not only when they commit acts of violence, but also when it is likely that they will commit non-violent crimes that are detrimental to the community. <u>See</u> <u>United States v. DiSano</u>, No. 18-CR-337-3 (WFK), 2018 WL 11191538, at *2 (E.D.N.Y. Dec. 14, 2018) ("Defendants pose a danger to the community not only when they commit acts of violence, but also when it is likely they will commit non-violent acts that are detrimental to the community."). To be sure, the defendant has not been deterred from committing crimes while on probation despite the knowledge that violation of any such condition could result in incarceration.

  Second, the defendant's affiliation with a violent enterprise like ICG is itself an ongoing danger to the community. ICG members and affiliates and the rivalries furthered by ICG have wreaked havoc on the community's residents. The defendant's participation in the senseless killing of a twelve-year-old boy in March 2022 is just one example of the violence ICG members and associates commit that endanger the lives of Brooklyn residents going about their everyday lives. The defendant knowingly associated himself with gang members engaged in violence, narcotics trafficking and fraud, and even published a story to social media where he appears to be holding a firearm. The defendant has continued to flaunt his ICG affiliation as recently as July 2024, while on probation, by posting references to "23" and other ICG members and associates. Where, as here, the defendant poses an ongoing risk of violence, there is no cause to construct an elaborate bail package like "home detention and electronic monitoring," or to seek to "replicate a detention facility without the confidence of security such a facility instills," <u>United States v. Millan</u>, 4 F.3d 1039, 1049 (2d Cir. 1993), when an order of detention will obtain the same result.

  Lastly, there are no conditions that could assure the defendant's compliance with the law given that he committed the instant offense while subject to various conditions intended to monitor his activity, such as the warrantless search of his electronic devices by his probation officer. Rather than comply with these conditions, the defendant refused to provide his phone to his probation officer for review. Further, the defendant has also demonstrated that he is willing to use others, including minors, to commit crimes as was the case for the October 2022 theft in New Jersey. His social media posts further demonstrate his commitment to involving others in criminal activity. Even when subjected to stringent conditions on probation, the defendant has shown that if he is not detained, he will use electronic devices and co-conspirators to carry out criminal activity.

7

      B.      <u>The Defendant Poses a Risk of Flight</u>

      The defendant poses a significant risk of flight given the nature of the offense charged and strength of the government's case. The defendant is charged with theft of government funds and aggravated identity theft. As it stands, the defendant faces a mandatory minimum sentence of twenty-four months to run consecutive to any sentence imposed on the theft crime. The defendant is incentivized to flee prosecution where he faces a mandatory term of incarceration. <u>See</u> <u>United States v. Motovich</u>, No. 21-CR-497 (WFK), 2025 WL 2300265, at *2 (E.D.N.Y. Aug. 8, 2025) (denying post-conviction one-day release finding that the defendant posed a risk of flight, in part because the defendant faced a "significant term[] of imprisonment, including a mandatory minimum sentence of twenty-four months' imprisonment for his conviction Aggravated Identity Theft . . .").

      The government's evidence is also strong. The defendant is charged with the theft of government funds and aggravated identity theft in connection with his embezzling of John Doe's check. It cannot be disputed that the check was recovered pursuant to a lawful probation search in the defendant's own bedroom. Moreover, John Doe has confirmed that neither the defendant, nor any other individual, had permission to use his name, or possess or deposit his check. Further, the government is in possession of evidence linking the defendant to additional crimes: namely, the defendant's possession of credit cards in names other than his own.

      As detailed above, the defendant has repeatedly refused to comply with the conditions of probation; this also demonstrates that he is a flight risk, as he has no respect for the law or court orders. <u>See</u> <u>United States v. Berkun</u>, 392 F. App'x 901, 903 (2d Cir. 2010) (upholding order of pretrial detention finding that the court properly relied on the defendant's attempted commission of a crime "while on bail, . . . thereby deceiv[ing] the court as to his willingness to conform his conduct to law"). In addition to his noncompliance, the defendant brazenly advertises his criminal conduct on social media, suggesting that he has complete disregard for his probationary term.

      When the incentives to flee are so strong, as here, no combinations of sureties and other restrictions can assure their appearance. That remains true even if the defendant accepts electronic surveillance and home confinement. <u>See</u> <u>United States v. Orena</u>, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks omitted).

V.      <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the court issue a permanent order of detention against the defendant to ensure his return to court and the safety of the community.

                                Respectfully submitted,

                                JOSEPH NOCELLA, JR.
                                United States Attorney

By:    <u>*/s/ Irisa Chen*</u>
         Irisa Chen
         Assistant U.S. Attorney
         (718) 254-6124

cc:      Clerk of the Court (by ECF and Email)
          Counsel for the Defendant (by ECF and Email)