UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

– against –

JONAH LUC,

*Defendant.*

---

**MEMORANDUM & ORDER**
25-cr-00273 (NCM)

**NATASHA C. MERLE**, United States District Judge:

Defendant Jonah Luc is charged with theft of government funds and aggravated identity theft in violation of 18 U.S.C. §§ 641 and 1028A. *See* Indictment, ECF. No. 6. Before the Court is Luc's motion to suppress (1) a U.S. Treasury Check ("Check") recovered from his home by a New York City probation officer and (2) statements Luc made to law enforcement during an August 21, 2025 search of his home. Mot. 1, ECF No. 20.[1] In the alternative, Luc requests an evidentiary hearing on the reasonableness of the search and whether his statements were made to officers during a custodial interrogation. *Id.*

For the reasons stated below, Luc's motion is **DENIED** as to the Check and his request for an evidentiary hearing is **GRANTED** as to his statements made to officers during and immediately after the search of his apartment.

---

[1]     The Court hereinafter refers to defendant's Motion to Suppress, ECF No. 20, as the "Motion"; the government's Memorandum of Law in Opposition to Defendant's Motion to Suppress, ECF No. 23, as the "Opposition"; and defendant's Reply Memorandum in Further Support of Motion to Suppress, ECF No. 28, as the "Reply." Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

**BACKGROUND**

On April 28, 2023, Luc pleaded guilty to one count of conspiracy to engage in a crime and one count of shoplifting in the Superior Court of New Jersey, Middlesex County. Mot. 2; Compl. ¶ 4 n.3, ECF No. 1; Ltr. Re. Perm. Order of Det. 3, ECF No. 2. The Superior Court sentenced Luc to a term of probation of three years. Compl. ¶ 4 n.3. On that date, he received and signed the conditions of his term of probation. *See* Opp'n Ex. A ("Probation Conditions"), ECF No. 23-1. The conditions provide, among other things, that Luc "shall permit [his] probation officer to visit [his] residence or any other suitable place" and that he "shall submit at any time to a search conducted by a probation officer, without a warrant, of [his] person, place of residence, vehicle, or other personal property." Probation Conditions ¶¶ 4–5; Mot. 2. Luc certified that he had "received a copy of the rules and conditions of probation which ha[d] been read and explained to [him]" and provided his residential address, a second-floor apartment in a residential building located in Brooklyn, New York, as well as his telephone number. Probation Conditions 3.

On August 21, 2025, officers from the New York City Department of Probation ("Probation Officers") conducted a compliance visit to Luc's residence based on information that he "may be in possession of an . . . illegal firearm[] [and] an active member of a Forged Document and theft by deception criminal group." Opp'n Ex. B ("Probation Narrative") 2, ECF No. 23-2; *see* Opp'n 6–7. The Probation Officers knocked on the door of Luc's apartment and were allowed entry and directed to Luc's bedroom by his uncle. Opp'n 7. The Probation Officers went to Luc's bedroom and informed him that they were conducting an unannounced visit to assess compliance with his conditions of probation. Opp'n 7; *see also* Compl. ¶ 4. During the search, one of the Probation Officers found in Luc's dresser drawer a United States Treasury check for $1,474.28 payable to an

individual identified as "John Doe" and listing John Doe's address (the "Check"). Mot. 1; Opp'n 7; Compl. 3–4 figs. 1 & 2. Shortly thereafter, the Probation Officers put Luc in handcuffs. Opp'n 8.

At around 7:41 a.m., officers from the New York City Police Department ("NYPD") and Homeland Security Investigations ("HSI") who were waiting outside defendant's apartment (collectively, "Police Officers") entered the apartment to take Luc to the 67th precinct for processing. Opp'n 8. The time from when the Police Officers entered Luc's apartment until Luc was transported to the 67th precinct is captured on a Police Officer's body-worn camera. Opp'n Ex. C ("Body Camera Footage"), ECF 23-3.

As the Police Officers walk up the stairs toward Luc's apartment, one can be heard saying "he's saying it's his friend's" and "he says it's his friend's." Body Camera Footage 01:03–01:09. When the Police Officers open the front door to the apartment, Luc, who is handcuffed in the living room, is saying "that's my card." Body Camera Footage 01:09–01:13. Luc continues speak, saying "like what, those is my cards, bro." Body Camera Footage at 01:16–01:22. The Police Officers then ask Luc about his clothing, and he continues to talk about the items found in the search, saying "that's my stuff." Body Camera Footage 01:25–01:30. At one point, Luc says to one of the Probation Officers "what are you talkin' 'bout" and "you dead lyin', that's crazy." Body Camera Footage 01:32–01:36. He then continues to insist that "all them is [his] cards," *id*. 2:10–02:13, "those is [his] cards," and that the card that says "Jojo Draco" is his card because "[his] nickname is Jojo," *id*. 02:34–02:45. During this time, the Probation Officers continue to search Luc's bedroom. Body Camera Footage 02:30–03:14.

Roughly three minutes into the footage, one of the Police Officers can be seen with the recovered Check and credit cards in his hand, standing to the right of where Luc is

seated in the living room of the apartment. Opp'n 9; Body Camera Footage 03:00–03:15. Luc says "Jojo Draco—that's a made up name, literally" and that it is his "nickname." Body Camera Footage 03:00–03:10. The officer then responds "So, Jojo Draco is . . ." and Luc replies "Jojo Draco is me, that's my made-up CashApp [name]." Opp'n 9; Body Camera Footage 03:19–03:23. The officer then, while holding out certain of the recovered credit cards, says, "Jojo Draco is you, these yours as well?" and Luc says that "Myasia" is his friend and that "Kendrik Whatchumacallit" is another of his made-up CashApp names. Opp'n 9; Body Camera Footage 03:23–03:40. The officer then holds up the Check in his left hand, and defendant states, "that—I don't—I seen that on the street, I just picked it up [be]cause I don't know, but I couldn't do nothing with it, honestly." Opp'n 9–10; Body Camera Footage 03:41–03:49. An NYC Probation officer can be heard saying, "I thought you said that . . ." before being cut off by Luc who says, "nah, the check, I found it on the street, I literally found it on the street." Opp'n 10; Body Camera Footage 03:49–04:07.

Luc then walked with a Police Officer to the officer's car. *See* Body Camera Footage 04:21–07:13. While sitting in the backseat of the car, with the door open, Luc asks the Police Officer "you going to booking?" Body Camera Footage 08:07–08:11. The officer responds that they are "going to go to the precinct first" and that the officer needs to "verify some information." Body Camera Footage 08:09–08:16. Luc then asks "what information" the officer needs to verify, and the officer says he needs to verify information based on the credit cards. Body Camera Footage 08:17–08:25. After a couple of seconds, Luc says, "I found that check on the floor," to which the officer responds "what's up [inaudible]?" Body Camera Footage 08:31–08:33. Luc repeats, "I found that check on the floor." Body Camera Footage 08:34–08:36.

On August 21, 2025, the government filed a Complaint alleging that Luc engaged in theft of government funds as well as aggravated identity theft in connection with his possession and conversion of the Check. *See* Compl. On September 4, 2025, a grand jury returned an indictment charging Luc with one count of theft of government funds, in violation of 18 U.S.C. § 641, and one count of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b) and 1028A(c)(1). *See* Indictment, ECF No. 6.

## DISCUSSION

Defendant moves to suppress the Check and his statements regarding the Check. First, he argues that because the conditions of his probation did not specifically provide for the warrantless search of his papers, and because the Probation Officers did not have a warrant to search his papers, the search was unreasonable and thus illegal. Mot. 2–8. Second, he contends that even if the scope of his probation search condition extended to his papers, the Probation Officers lacked the required reasonable suspicion to conduct the search. Reply 3–5. Finally, defendant claims that the officers, by handcuffing and showing him the items recovered in the search, effectively subjected him to a custodial interrogation without first providing *Miranda* warnings. Mot. 8–9; Reply 5–7.

### I.      Suppression of the Check

Defendant argues that his papers should not have been searched without a warrant because none of the conditions of his probation specifically provided for such a search. Mot. 2–8. Papers, defendant argues, are "uniquely private" as evidenced by the fact that they are "specifically mentioned in the Fourth Amendment and subject to special Fourth Amendment protections." Mot. 2. Citing "the Founders' deep concern with safeguarding the privacy of thoughts and ideas," defendant asserts that documents should not be treated like other kinds of property for purposes of the Fourth Amendment. Mot. 2–3

5

(first quoting *United States v. Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013); and then quoting *United States v. Seljan*, 547 F.3d 993, 1017 (9th Cir. 2008)).[2] Defendant argues that "[r]eading a person's personal [papers] is a far greater intrusion than a search for [physical] contraband because it can invade a person's thoughts," Mot. 3 (quoting *Winfield v. Trottier*, 710 F.3d 49, 55–56 (2d Cir. 2013)), and that papers are distinct from physical contraband because "they must be examined for their relevancy to be determined." Mot. 7.

Here, defendant says that "law enforcement had to examine the check to determine it was contraband, and without doing so would not know if it was contraband as opposed to something highly private subject to special Fourth Amendment protection." Reply 2. Defendant analogizes his search to cases granting suppression of information gathered by law enforcement's warrantless search of cell phones where the phones were not mentioned in the defendant's probation search conditions, Mot. 5–6, and explains that—like cell phones—papers are more than "mere property." Mot. 8. Accordingly, defendant argues that because papers are "specifically mentioned in the Fourth Amendment, *and* specifically omitted from [defendant]'s search condition, they should not have been searched here." Mot. 8 (emphasis in original).

For its part, the government argues that the Check should not be suppressed because it was seized subject to a valid probation search condition authorizing the warrantless search of defendant's residence and did not result from a search of defendant's papers. Opp'n 11–12. Therefore, any privacy interest defendant may have had disappeared once the officer "discovered the contraband stolen Check." Opp'n 13. (citing

---

[2]     Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

*Illinois v. Andreas*, 463 U.S. 765, 765 (1983)). The government contends that the Check did not reflect defendant's "thoughts and ideas," so his arguments invoking the special Fourth Amendment protections of papers are inapposite. Opp'n 14. Rather, the government points to cases in which courts upheld the warrantless seizure of United States Treasury checks and other contraband financial instruments where the seizure was made pursuant to parole and probation search conditions that did not specify the ability to search a parolee or probationer's papers. Opp'n 15. The government notes that the Check is unlike a cell phone given the "voluminous amount of personal data" cell phones contain. Opp'n 15–16. Finally, the government argues that even if the Court were to find the seizure of the Check to be a violation of the Fourth Amendment, suppression is not warranted because any such violation was devoid of "deliberate, reckless, or grossly negligent intent." Opp'n 17.

In this instance, the government has the better of the arguments.

First, the Check was recovered pursuant to a search that was authorized by an express condition of defendant's probation.[3] While defendant's argument regarding the "special Fourth Amendment protections" of papers is well taken, Mot. 2, it is ultimately unavailing because the Check is more akin to physical contraband.

Second, Probation's search of defendant's apartment was supported by reasonable suspicion. Probation conducted a compliance search of defendant's apartment pursuant to a valid condition of his probation and based on specific information that it received

---

[3] The cases defendant cites regarding searches conducted absent an express probation search condition, Mot 4 n.1, are unavailing because it is undisputed that defendant consented to the condition permitting the warrantless search of his "place of residence" and "personal property." Probation Conditions ¶ 5. As discussed below, the Check was not the kind of "paper" entitled to special protection under the Fourth Amendment.

from HSI that defendant was, among other things, involved in a criminal theft by deception group—i.e., involved in the very conduct for which he was placed on probation in the first place.

Accordingly, defendant has not raised a dispute of material fact, no evidentiary hearing is needed to decide defendant's motion to suppress the Check, and the motion is denied.

### A.       Scope of the Probation Condition

The thrust of defendant's argument is that papers are distinct from, and entitled to more protection than, physical objects or property. Mot. 2–3, 8. Papers are unique, defendant argues, because they contain a person's "thoughts and ideas," Mot. 2, which could include "highly private" information like their "political or religious affiliation [] or even sexual preferences[,]" Reply 2. Thus, defendant contends, in light of the "conspicuous[] omi[ssion]" of a probation search condition regarding defendant's papers, the Probation Officers should not have examined the Check without a warrant. Mot. 3, 8. The Court disagrees. Some papers warrant special Fourth Amendment protection; here, the Check does not.

#### i.       *Legal Standard*

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. const. amend. IV. "Warrantless searches and seizures are per se unreasonable under the Fourth Amendment[,] subject only to a few specifically established and well-delineated exceptions." *United States v. Weaver*, 9 F.4th 129, 138 (2d Cir. 2021) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). As such, "the burden is on the government to establish that the search or seizure fits within one of the

exceptions to the warrant requirement." *United States v. Haskins*, No. 21-cr-00269, 2022 WL 1460277, at \*7 (E.D.N.Y. May 9, 2022). However, because "the very assumption of the institution of probation" is that an individual on probation "is more likely than the ordinary citizen to violate the law," *United States v. Knights*, 534 U.S. 112, 120 (2001) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 880 (1987)), individuals on probation "do not enjoy the absolute liberty to which every citizen is entitled," *Id*. at 119. Accordingly, "[a] [probationer]'s expectation of privacy is further diminished where he has consented to a search condition. *United States v. Jackson*, 663 F. App'x 31, 33 (2d Cir. 2016) (summary order) (citing *Knights*, 534, U.S. at 118, 122). Therefore, "when an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id*. (quoting *Knights*, 534 U.S. at 121). "Under such circumstances, the Fourth Amendment does not require the officer to obtain a warrant." *Id*. (citing *Knights*, 534 U.S. at 121–22).

ii.    *Application*

The mere fact that the Check is printed on paper does not mean that the Probation Officers exceeded the scope of defendant's probation condition by searching it. The Check is a physical object. It displays a name that is not defendant's name and an address that is not defendant's address. *See* Compl. 3–4, figs. 1 & 2; Opp'n 14; Probation Narrative 3 ("During the search, [the officer] recovered one government-issued check not bearing the probationer's name."). Thus, like any physical contraband, its "relevance is . . . easily ascertainable." *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976). The Check was recovered pursuant to a valid probation search condition—the one that authorized the

9

warrantless search of defendant's place of residence or personal property. Probation Conditions 2.

A different conclusion might be appropriate had the officers found the Check while opening and "[r]eading . . . [defendant]'s personal mail," because that "is a far greater intrusion than a search for contraband." *Winfield*, 710 F.3d at 55, 57 ("It is a Fourth Amendment violation when a police officer reads a suspect's private papers, the text of which is *not* in plain view. . . ." (emphasis added)). It would be similarly problematic if the officers had discovered a picture of the Check while searching defendant's personal cell phone because "[cell phones] also contain[] a broad array of private information never found in a home in any form—unless the phone is." *Riley v. California*, 573 U.S. 373, 396–97 (2014). But the privacy interests attendant to an individual's private mail or personal cell phone have no application to the discovery of a U.S. Treasury check, recovered in a probationer's residence, pursuant to a search of that residence that is explicitly authorized by a probationer's conditions of probation. *See United States v. Williams*, 650 F. App'x 977, 978 (11th Cir. 2016) (affirming denial of motion to suppress eight U.S. Treasury checks discovered in probationer's nightstand where probationer had agreed to "submit to a warrantless search to his person, residence and vehicle").

B.     Reasonable Suspicion

Defendant contends that "[r]egardless of how the Court construes the probation condition, a hearing is necessary to determine the reasonableness of the search under the totality of the circumstances," Mot. 10, because "the government's factual proffer that the probation department possessed information from other agencies plainly cannot satisfy the reasonable suspicion requirement," Reply 3. The Court disagrees.

### i.    Legal Standard

In general, "a defendant seeking the suppression of evidence is not automatically entitled to an evidentiary hearing on the claim, but must make a preliminary showing of facts which, if proved[,] would require the granting of relief." *United States v. Lemos*, No. 10-cr-00954, 2013 WL 149646, at *2 (E.D.N.Y. Jan. 11, 2013). Absent a contested issue of material fact, a defendant is not entitled to an evidentiary hearing. *United States v. Grant*, No. 06-cr-00732, 2008 WL 111169, at *1 (E.D.N.Y. Jan. 8, 2008) (citing *United States v. Pena,* 961 F.2d 333, 339 (2d Cir. 1992)). "To create a factual dispute, a defendant must submit sworn factual allegations from a person with personal knowledge of the underlying facts." *United States v. Gomez*, No. 23-cr-00311, 2024 WL 1704970, at *2 (S.D.N.Y. Apr. 18, 2024). "[I]n the absence of such an affidavit, an evidentiary hearing is unnecessary." *Id.* Further, an evidentiary hearing is not necessary if the defendant's allegations are general and conclusory. *United States v. Manuchekhri*, No. 25-cr-00088, 2026 WL 947658, at *8 n.10 (E.D.N.Y. Apr. 8, 2026).

"District Courts have broad discretion when deciding whether or not to hold a suppression hearing." *United States v. Shamsideen*, No. 03-cr-01313, 2004 WL 1179305, at *9 (S.D.N.Y. Mar. 31, 2004); *see also United States v. Chandler*, 164 F. Supp. 3d 368, 376 (E.D.N.Y. 2016) ("[An] affidavit, which does not dispute the incidents referenced in the Government's papers . . . . ordinarily would not create a dispute of fact necessitating an evidentiary hearing . . . .").

### ii.    Application

Here, there is no dispute that defendant was on probation at the time of the search and subject to a condition permitting the search of his residence. Compl. ¶ 4; Probation Conditions 2. Thus, the Government had a "weighty interest in enforcing th[e] condition,"

*Chandler*, 164 F. Supp. 3d at 378, and defendant had a "significantly diminished" interest in privacy, *Knights*, 534 U.S. at 119–20. Therefore, the search by the probation office was "acceptable under *Knights* if based upon reasonable suspicion (or potentially a lesser standard)." *United States v. Lifshitz*, 369 F.3d 173, 181 (2d Cir. 2004). Reasonable suspicion exists when there are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion on a citizen's liberty interest." *United States v. Lajeunesse*, 85 F.4th 679, 687 (2d Cir. 2023).

Probation received information from HSI that defendant "may [have] be[en] in possession of an . . . illegal firearm[]" and be "an active member of a Forged Document and theft by deception criminal group." Probation Narrative 2. "[S]pecific information from law enforcement officials" that suggests "contraband might be found in [a probationer]'s home" is sufficient to establish reasonable suspicion. *See United States v. Townsend*, 371 F. App'x 122, 125 (2d Cir. 2010) (summary order); *United States v. Washington*, No. 12-cr-00146, 2012 WL 5438909, at *10 (S.D.N.Y. Nov. 7, 2012) ("[I]n light of [his] duties as a parole officer, the Court concludes that [the officer's] decision to initiate a search of [the d]efendant's apartment based on the information provided by [an] FBI [a]gent . . . was rational and reasonable."); *see United States v. Elmore*, 482 F.3d 172, 181 (2d Cir. 2007) ("Where the informant is known from past practice to be reliable . . . no corroboration will be required to support reasonable suspicion.").

Moreover, Probation was aware that defendant was on probation for conspiracy to commit a crime and shoplifting—in other words, committing theft with a group of people. *See* Compl. ¶ 4 n.3. While it is true that "the criminal status of the probationer cannot, viewed on its own, be sufficient to support a determination that reasonable suspicion exists," *Lifshitz*, 369 F.3d at 188, consideration of a probationer's "criminal history in

12

combination with other pertinent factors can legitimately sustain reasonable suspicion," *United States v. Gschlecht*, No. 19-cr-00254, 2020 WL 1640195, at *4 (D. Conn. Apr. 2, 2020). Further, defendant's declaration does not dispute the material facts. It says, in sum: (1) "[he] is the defendant in the above captioned matter[,]" (2) "prior to [his] arrest, [his] place of residence was 357 East 28th Street, Brooklyn, NY 11226[,]" and (3) "[a]s referenced in Paragraph 4 of the complaint in [his] case, the New York City Department of Probation conducted a search of [his] residence on August 21, 2025." Def's Decl. 1, ECF No. 20-1.

Here, the information from HSI regarding defendant's potential involvement in a "theft by deception criminal group," Probation Narrative 2, coupled with his prior conviction for conspiracy and shoplifting provided Probation with "reasonable suspicion that a probationer subject to a search condition [wa]s engaged in criminal activity," *Knights*, 534 U.S. at 121. Accordingly, the officers had reasonable suspicion to search Luc's residence, and there are no factual disputes warranting an evidentiary hearing on defendant's motion to suppress the Check.

## II.   Statements Made to Probation and Police Officers

Defendant argues that the statements he made to the Probation and Police Officers regarding the Check should be suppressed because he was subjected to a custodial interrogation in the absence of *Miranda* warnings. Mot. 8. He asserts that, by showing him the Check with "the obvious expectation of eliciting an incriminating response," the Probation and Police Officers engaged in the functional equivalent of an interrogation. Mot. 9 (citing *United States v. Broughton*, 600 F. App'x 780, 783 (2d Cir. 2015)). Moreover, defendant notes that the circumstances under which he made the statements

are unclear, as the body camera footage begins after he is already in handcuffs and speaking with Probation Officers. Reply 5–6.[4]

The government counters that defendant's statements should not be suppressed because they were made as part of a conversation initiated by him and because merely showing defendant the Check did not amount to an interrogation. Opp'n 18.

Because the body camera footage does not shed light on the circumstances immediately preceding defendant's statements, and the government has not provided a declaration clarifying the circumstances, the Court cannot conclude the defendant's statements about the recovered items were voluntary and an evidentiary hearing is necessary.[5]

### A.    Legal Standard

"In *Miranda v. Arizona,* the Supreme Court held that the in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Georgison v. Donelli,* 588 F.3d 145, 154 (2d Cir. 2009) (citing *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). It is well settled that *Miranda* requires all individuals who are under arrest, or otherwise in police custody, to be

---

[4]    It is unclear which statements defendant seeks to suppress. In his Motion he appeared focused on the statements regarding the Check. Mot. 9 ("The officer in the video affirmatively displays to Mr. Luc the incriminating items found, including the Treasury Check, with the obvious expectation of eliciting an incriminating response."). In his Reply, however, he contends that "[a] hearing is . . . necessary concerning the circumstances of *all* [of his] statements." Reply 5 (emphasis in original). The Court assumes this will be clarified at the evidentiary hearing.

[5]    The government has not provided an affidavit to establish that defendant's statements were voluntary. Indeed, the narrative statement from the NYC Department of Probation recounting the events of August 21, 2025 says that defendant was "asked about the check." Probation Narrative 3.

informed prior to interrogation, *inter alia,* of their right to remain silent and to have an attorney present during questioning. *Id.* at 155.

*Miranda's* warning requirements, however, apply only to "custodial interrogation." *United States v. Newton,* 369 F.3d 659, 669 (2d Cir. 2004) (quoting *Miranda*, 384 U.S. at 444). An interrogation includes "any words or actions that are likely to have the force of a question on the accused and therefore be reasonably likely to elicit an incriminating response." *United States v. Carr*, 63 F. Supp. 3d 226, 237 (E.D.N.Y. 2014); *see also Broughton*, 600 F. App'x at 783 ("[I]nterrogation can take the form of express questioning or its functional equivalent, which includes words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."). In assessing whether the police "should have known" that their actions were reasonably likely to elicit an incriminating response, courts consider "the totality of the circumstances." *Broughton*, 600 F. App'x at 783 (quoting *Acosta v. Artuz,* 575 F.3d 177, 191 (2d Cir. 2009)).

That said, "[v]olunteered statements of any kind are not barred by the Fifth Amendment" and, thus, do not require preliminary advice of rights. *United States v. Rommy*, 506 F.3d 108, 132 (2d Cir. 2007) (quoting *Miranda,* 384 U.S. at 478). Where a defendant has alleged police custodial interrogation in the absence of *Miranda* warnings, "the burden shifts to the government to prove *Miranda* voluntariness." *United States v. Northover*, No. 25-cr-0087, 2026 WL 1179599, at *5 (S.D.N.Y. Apr. 30, 2026).[6]

---

[6]    It is undisputed that defendant, who was handcuffed, was in custody. *See Newton*, 369 F.3d at 677 ("[W]e must conclude that handcuffing [the defendant], though reasonable to the officers' investigatory purpose under the Fourth Amendment, nevertheless placed him in custody for purposes of *Miranda*.").

15

B.        Application

Here, the government asserts that "defendant's claim that he was subjected to interrogation, or its functional equivalent, . . . is belied by the [body camera] video recording of his statements." Opp'n 20. The body camera footage, however, begins with defendant *already* in handcuffs and depicts him in what appears to be mid-conversation with the Probation Officers. Body Camera Footage 01:09–01:13. Moreover, *before* the Police Officers enter the apartment, one can be heard saying "he's saying it's his friend's" and "he says it's his friend's," Body Camera Footage 01:03–01:09, suggesting that defendant had been talking to the Probation Officers inside the apartment and the Probation Officers had been relaying that information to the Police Officers outside the apartment. Moreover, defendant asks one of the Probation Officers—the officers present in the apartment with defendant before there is any body camera footage—"what are you talkin' 'bout" and "you dead lyin', that's crazy." Body Camera Footage 01:32–01:36. These statements suggest that there was a conversation between the Probation Officers and defendant that is not reflected in the Body Camera Footage.

The Court cannot evaluate "the totality of the circumstances" under which defendant's statements were made, *Broughton*, 600 F. App'x at 783, when it has no details regarding what precipitated those statements in the first place. Indeed, the "defendant's numerous volunteered statements about the seized contraband and the [Police O]fficer's brief clarification," Opp'n 21, may in fact give rise to an interrogatory environment depending on what happened before the Police Officers entered the apartment. *Rommy*, 506 F.3d at 132 ("The relevant inquiry in deciding whether words or actions constitute interrogation focuses primarily upon the perceptions of the suspect, rather than the intent

16

of the police."). Thus, there is a "disputed issue[] of material fact" regarding the nature of defendant's statements to the officers. *Washington*, 2012 WL 5438909, at *8.

Accordingly, the Court grants defendant's request for an evidentiary hearing to determine whether defendant's challenged statements were the product of a custodial interrogation.

## CONCLUSION

For the foregoing reasons, defendant's motion to suppress is **DENIED** with respect to the Check. Defendant's request for an evidentiary hearing is **GRANTED** with respect to the statements he made to officers during and immediately after the search of his apartment on August 21, 2025. Defendant's motion to suppress those statements is denied without prejudice and with leave to renew following the conclusion of the evidentiary hearing.


**SO ORDERED.**

　　　　　　　　　　　　　　　　　　 　_/s/ Natasha C. Merle_
　　　　　　　　　　　　　　　　　　　NATASHA C. MERLE
　　　　　　　　　　　　　　　　　　　United States District Judge

Dated:　　　　May 12, 2026
　　　　　　　Brooklyn, New York

17