UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

JONAH LUC

*Defendant.*

**MEMORANDUM & ORDER**
25-cr-00273 (NCM)

**NATASHA C. MERLE**, United States District Judge:

In June of 2026, defendant Jonah Luc stood trial under an indictment charging him with two counts: 1) theft of government funds, in violation of Title 18, United States Code, § 641 ("Count One"), and 2) aggravated identity theft, in violation of Title 18, United States Code, §§ 1028A(a)(1), 1028A(b), and 1028A(c)(1) ("Count Two"). At trial, the government's theory of the case was that Mr. Luc deposited and withdrew the proceeds of a United States Treasury Check for $1,474.28 ("the Check") made out to someone else ("John Doe"), by fraudulently endorsing the Check to another individual ("Individual-1"). At the close of the government's case, Mr. Luc made a motion under Federal Rule of Criminal Procedure 29 for a judgment of acquittal as to both counts. *See generally* Mot.[1]

[1] The Court hereinafter refers to defendant's Memorandum in Support of Motion for Judgment of Acquittal, ECF No. 69, as the "Motion"; the government's Memorandum of Law Opposing Defendant's Motion for Judgment of Acquittal, ECF No. 71, as the "Opposition"; and defendant's Reply Memorandum in Further Support, ECF No. 72, as the "Reply."

The Court reserved ruling as to both counts at the time the motion was made.[2] As to Count Two, Mr. Luc argues that the government failed to present sufficient evidence that he (1) knew the Check belonged to a real person, (2) used John Doe's means of identification, and (3) used John Doe's means of identification "during and in relation" to the theft of government funds within the meaning of the aggravated identity theft statute. Mot. 1; *see also* Reply. The government opposes, arguing that it presented overwhelming proof that defendant possessed and used John Doe's identity to steal and convert government funds. *See generally* Opp'n.

Because the evidence was insufficient to establish that defendant possessed or used John Doe's means of identification in a way that was at the crux of his theft of government funds, Mr. Luc's motion for judgment of acquittal as to Count Two of the indictment is **GRANTED**.

## BACKGROUND

### I. Procedural History

This case began on August 21, 2025, when the government filed a complaint charging defendant with theft of government funds and aggravated identity theft. *See* Compl. ECF No. 1. On September 4, 2025, a grand jury indicted defendant on the same charges. *See* Indictment, ECF No. 6. Jury selection began on June 1, 2026. *See* Minute Entry dated June 1, 2026. Later that day, and continuing through June 2, 2026, the government introduced the testimony of five witnesses in support of its case against defendant. *See* Minute Entries dated June 1, 2026 and June 2, 2026. On June 2, after the

---

[2] Defendant only submitted briefing as to Count Two but "maintains [his] general challenge to the sufficiency of each count." Mot. 1. The Court finds that there was sufficient evidence for a rational juror to find defendant guilty of Count One beyond a reasonable doubt. Accordingly, defendant's motion as to Count One is DENIED.

close of the government's case, defendant moved for a judgment of acquittal under Rule 29 on both counts. Minute Entry dated June 2, 2026; Mot. 1.[3] The Court reserved ruling on defendant's motion pursuant to Federal Rule of Criminal Procedure 29(b). Later that day, the jury reached a verdict of guilty on both counts. Minute Entry dated June 2, 2026. Defendant's Motion was fully briefed on July 22, 2026. *See* Reply.

## II. Evidence Presented at Trial

Viewed in the light most favorable to the government, *see United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008), the evidence at trial established the following facts.

On August 21, 2025, Officer Garrett Hall conducted a search of defendant's apartment. June 1 Tr. 54:22–58:1, ECF No. 73.[4] During that search, Officer Hall recovered a U.S. Treasury check for $1,474.28 payable to John Doe—that is, the Check—inside the top drawer of a dresser in defendant's bedroom. June 1 Tr. 58:12–59:1; *see* GX 1. The Check was a real, unaltered U.S. Treasury check. GX S-1 (stipulating that "Exhibit 1 is a tax refund check issued by the United States Department of the Treasury in 2025 to [John Doe].").

Defendant gave inconsistent accounts of how he obtained the check. When Officer Hall asked defendant about the Check, defendant first stated that he and a friend found the Check, then that a friend found the Check and gave it to him. June 1 Tr. 59:3–11. Later, as captured by Detective Salvatore Rizzo's body camera, defendant said that he found the check "on the street," but "didn't do anything with it." June 2 Tr. 163:11–164:24, ECF No.

---

3 Throughout this Order, page numbers for docket filings generally refer to the page numbers assigned in ECF filing headers.

4 For citations to the trial transcript, page numbers correspond to the page number in the top right corner of the transcript, not the page number in the ECF filing header.

74. Finally, while waiting to be driven to the police precinct, defendant said that he found the Check "on the floor." June 2 Tr. 165:25–166:10.

The Check represented John Doe's 2024 tax refund, which he never received. June 1 Tr. 44:10–20; *see* June 1 Tr. 41:3–42:11; GX 200; GX 201. The Check bore John Doe's name and home address in Staten Island, including his apartment number, on the front, as well as his name in the form of a forged signature on the back. June 1 Tr. 43:8–44:20. John Doe did not authorize anyone to possess or use the Check. June 1 Tr. 44:2–20. John Doe received a letter from the IRS informing him that his tax refund had been compromised. June 1 Tr. at 41:7–8; GX 200. When shown the letter at trial, John Doe confirmed his home address, which was the same address printed on the Check found in defendant's bedroom. June 1 Tr. 41:20–42:11. John Doe also confirmed that the signature on the back of the Check "look[ed] nothing like" his signature. June 1 Tr. 45:20–21. John Doe never met defendant prior to trial. June 1 Tr. 44:19–20.

In addition to the above testimony, the government established the following timeline through defendant's social media posts, Capital One bank records, IP records, and video surveillance: By at least July 29, 2025, defendant had access to Individual-1's Capital One bank account. GX 104 (July 29, 2025 social media post holding a Capital One debit card). Defendant used that account to deposit the Check via Capital One's mobile deposit feature. GX 105 (August 1, 2025 social media post of the successful mobile deposit, taken one minute after the Check had been deposited and referring to the funds as "easy money"); *see* GX 209 (Capital One records showing deposit at 12:37 p.m. from IP address matching defendant's IP subscriber records); GX 220 (IP subscriber records for defendant's home). Defendant maintained access to Individual-1's bank account after the Check was deposited until at least August 4, 2025, when he withdrew $670.00 from the

account. June 1 Tr. at 80:3–81:21 (testimony of Capital One fraud investigative analyst Abby Zetocha-Tasto); GX 108-A (August 4, 2025 social media post from defendant's account showing a person holding hundred-dollar bills in front of an ATM); GX 301 (August 4, 2025 ATM video footage of defendant taking out his cell phone and pointing the camera at the ATM as the flash from his phone lights up and then removing the withdrawn cash).

Relevant here, Capital One's mobile banking policies generally prohibit third-party endorsements on mobile deposits. Individuals can use the Capital One mobile application to deposit a check by taking a photograph of the check, June 1 Tr. 69:17–70:1, but typically the bank "do[es] not allow third-party endorsements" on checks deposited this way. June 1 Tr. 69:5. There are only a "few exceptions" to this policy, and they "can only be made at a branch with a teller" and with "both parties . . . present." June 1 Tr. 69:5–16. When a check is mobile deposited, Capital One "scan[s] the check image," and "[that] image of the check is sent to the payor's bank to request the funds." June 1 Tr. 98:14–15, 99:12–14. The payor's bank "verifies the check and [then] releases the funds to Capital One." June 1 Tr. 99:15–17.

### III. Jury Instructions and Verdict

After both sides rested, the Court charged the jury. June 2 Tr. 176:4–210:22. As is relevant here, the Court instructed the jury: (1) on the requirement that the defendant knew the means of identification was that of an actual person; (2) on the definition of a means of identification; and (3) that the use, transfer, or possession of the means of identification must be at the crux of criminality.

As to knowledge, the Court instructed the jury that "[a] person acts knowingly if he or she acts intentionally and voluntarily, and not because of ignorance, mistake, accident,

or carelessness." June 2 Tr. 199:18–20. The Court further instructed that "the [g]overnment must prove both that the means of identification was that of an actual person and that the defendant knew that the means of identification was that of an actual person." June 2 Tr. 207:8–11.

As to "means of identification," the Court instructed the jury that:

> The term "means of identification" means any name or number that [a] person used alone or in conjunction with any other information to identify specific individuals including any name, Social Security Number, date of birth, official state or government-issued driver's license or identification number, alien registration number, government passport number, identification of employer, or Taxpayer Identification Number or unique biometric data such as a fingerprint, voice print, retina or iris image or other unique physical representation or unique electronic identification number, address, or routing code or electronic serial number or any other number or signal that identifies a specific telecommunications issue or account or a specific communication transmitted from the telecommunication instrument.

June 2 Tr. 205:13–206:2.

And as to use of the identity being the crux of criminality, the Court instructed the jury that:

> A person uses, transfers, or possesses a means of identification in relation to a crime if the means of identification had a purpose, role, or effect with respect to the crime. That means the means of identification must do more than facilitate or further the predicate offense. It must have been at the crux of criminality. If you find the defendant "not guilty" on Count One, it means that the Government has not proved the second element of Count Two and you must also find him "not guilty" on Count Two. In other words, if you find that the Government has not proved beyond a reasonable doubt that a defendant committed theft of government funds as charged in Count One, you must also find him not guilty on Count Two.

June 2 Tr. 207:20–208:7.

After deliberations, the jury returned with a verdict of guilty on both counts. Jury Verdict, ECF No. 65.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 29(a), "[a]fter the government closes its evidence or after the close of all evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).[5] In making this challenge, the defendant indeed "bears a heavy burden," *United States v. Hamilton*, 334 F.3d 170, 179 (2d Cir. 2003), as the Court "must credit every inference that could have been drawn in the government's favor, and affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt," *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006) (internal citations omitted). If "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the Court cannot grant the motion. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

## DISCUSSION

Section 1028A, titled "Aggravated Identity Theft," provides as follows: "[w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A(a)(1). Subsection (c) includes theft of government funds, 18 U.S.C. § 641 (Count One), as a predicate offense. 18 U.S.C. § 1028A(c)(1). A "means of identification" is "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." 18 U.S.C.

---

5 Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

§ 1028(d)(7)(A). The use of the "means of identification" must be "at the crux of what makes the underlying offense criminal, rather than merely an ancillary feature" of the offense. *Dubin v. United States*, 599 U.S. 110, 114 (2023).

Defendant argues that the government failed to put forth sufficient evidence for any rational juror to conclude that he is guilty of aggravated identity theft. Mot. 4–12. In defendant's view the government did not carry its burden to establish any of the three elements of aggravated identity theft: knowledge, use of a means of identification, or use of that means of identification in a way that is the crux of criminality. The Court addresses each element in turn.

## I. Knowledge

First, defendant says that "there was no evidence that [he] knew the name on the check belonged to a real person." Mot. 4. Defendant notes that he "did not have anyone's personal identifying information and there was no evidence he had stolen the check or gotten it in a manner suggesting it was made out to a real person." Mot. 4. Of note, defendant asserts, is the fact that he "did not obtain the victim's account or personal information through hacking, dumpster diving or any other means" contemplated by the legislature when it enacted the aggravated identity theft statute. Mot. 5; *see* Reply 2 (citing Brief For the United States, *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), No. 08-108, 2009 WL 191837, at *21–22). Further, John Doe testified that he never met and did not know defendant. Mot. 5. At most, defendant argues, the evidence merely establishes that he "obtained a check made out to someone else through some unknown means" and therefore knew "that he was participating in some sort of crime." Mot. 5.

Defendant notes that this is not a case where knowledge can be inferred, like those involving repeated uses of an identity, or those involving a scheme that depends on

someone's credit history. Mot. 6–7. And defendant rejects the arguments the government made at trial, that he knew the Check belonged to a real person because it was "from the U.S. Treasury, and [] said it was for a tax refund," "because he got the money from it," and "because the IRS isn't going to pay someone $1,400 . . . who isn't a real person, who didn't file their taxes," Mot. 7 (citing June 2 Tr. 259:15–20). According to him, these arguments are of no moment because there was no evidence showing that he "knew anything about the functions of the IRS," and, in any case, "payees on checks are routinely altered." Mot. 7.

The government counters that a reasonable juror could draw the "straightforward" inference that "authentic U.S. Treasury checks are only issued to real people." Opp'n 19. Given that the Check "bore several indicia of legitimacy" including "personal information about John Doe," and the absence of evidence suggesting the Check was altered, the government asserts that it is reasonable to infer defendant knew the Check belonged to a real person. Opp'n 19–20.

Moreover, the government asserts that the jury could infer that defendant knew that John Doe was a real person based on defendant's successful deposit of the Check, successful withdrawal of the funds from the Check, and social media statements after that deposit and withdrawal. Opp'n 20–21. The government says that the fact that defendant was able to deposit the Check and withdraw funds from it, "confirmed [its] legitimacy." Opp'n 20. And the fact that defendant referred to the Check as "easy money" on his social media account, the government suggests, cuts against any inference that it was inauthentic or altered. Opp'n 20. In the government's view, a fake or fraudulent check would be less likely to be successfully deposited and therefore could not constitute "easy money." Opp'n 20. The government argues that a rational juror could reasonably put these pieces—

successful deposit, successful withdrawal, and posting about "easy money"—together to conclude that defendant knew John Doe was a real person. Opp'n 20. The Court agrees.

A reasonable juror could infer that defendant knew that a U.S. Treasury Check, bearing all of the attributes one would expect of an IRS refund check and containing no evidence of alteration, belonged to a real person. As the government says, that inference is "straightforward." Opp'n 19. While it may be true that "checks are routinely altered" and conceivable that defendant may not have "kn[own] anything about the functions of the IRS," Mot. 7, those possibilities, at most, create "competing inferences that can be drawn from the evidence." *United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021). They do not establish that it is unreasonable to infer defendant's knowledge that John Doe was a real person from an authentic government document bearing his name and address. *See* GX S-1 (stipulating that the Check was issued by the United States Department of Treasury in 2025 to John Doe).[6]

---

[6] The government's analogy to *United States v. Holmes* is not on point. *See* Opp'n 20. There, the Eleventh Circuit affirmed the defendant's conviction for aggravated identity theft after finding "highly probative" the fact that defendant had successfully used the victim's birth certificate and social security card twice *prior to the charged offenses*. 595 F.3d 1255, 1258 (11th Cir. 2010). The court also found relevant the defendant's "willingness to subject the [victim's] social security card repeatedly to government scrutiny," reasoning that a juror could conclude that behavior "established that [the defendant] knew, all along, that the social security card belonged to a real person and was not a forgery." *Id.* Finally, the court noted that "a reasonable jury could have found that [the defendant] would not have sought credit using [the victim]'s personal information if [the defendant] were not confident that [the victim] likely had an actual credit history." *Id.* Here, by contrast, there was no evidence that defendant had used John Doe's name before or that he had repeatedly subjected the Check to scrutiny. Indeed, the evidence established that he deposited the Check one time. The Court reads *Holmes* as concluding that the defendant was "confident" that the victim had an actual credit history, and was thus a real person, based on the defendant's successful and repeated uses of the victim's identity, *see id.* at 1257–58 ("[The defendant] admitted that she applied for Florida driver's licenses and identification cards using [the victim]'s name and social security number and that Florida issued licenses or cards to her in 2002, 2003, 2004, and 2007. . . . [The defendant] also used [the victim]'s

Similarly, a reasonable juror could conclude that defendant knew John Doe was a real person when he successfully deposited the Check and withdrew the funds associated with it. Again, although it is conceivable that the bank made an error and accepted and cashed a check that actually belonged to no one, the jury is not required to make that inference. Indeed, it is likely more reasonable to infer that a person who successfully deposits and withdraws funds from a check—and a U.S. Treasury Check at that—knows that check belongs to a real person. *See Reifler*, 446 F.3d at 94 (collecting cases and observing that "[p]ieces of evidence must be viewed not in isolation but in conjunction" on a Rule 29 motion.).

Defendant's attempts to avoid this conclusion by discussing the statute's legislative history and distinguishing the government's cases, Reply 2–5, are ultimately beside the point regarding the knowledge inquiry because the evidence *in this case*—that the defendant successfully deposited and withdrew funds from an authentic U.S. Treasury Check bearing John Doe's name and address—was sufficient for a reasonable juror to infer beyond a reasonable doubt that defendant knew John Doe was a real person.

## II. Means of Identification

Defendant contends he did not use a "means of identification" within the meaning of the aggravated identity theft statute by simply "[s]igning [his] name to a single check."

---

personal information to secure a line of credit that she used to purchase a 2007 Chrysler, which she registered in Florida in [the victim]'s name."), not based on the mere fact that the defendant sought credit using the victim's identity. Indeed, by the time the defendant in *Holmes* used the victim's identity to secure a line of credit, she would have been virtually certain that the victim was a real person given that she had "successfully used [the victim]'s birth certificate to obtain a passport" three years prior. *Id*. at 1257–58. It is entirely unclear whether the court in *Holmes* would have come to the same conclusion if the defendant's only offense was a one-time attempt to use the victim's identity to obtain credit.

Mot. 11–12. This argument warrants little discussion because it is foreclosed by the plain language of the statute. "[T]he term 'means of identification' means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any—name[.]" 18 U.S.C. § 1028(d)(7)(A); *see United States v. Dumitru*, 991 F.3d 427, 432 (2d Cir. 2021) (recognizing that even though the various parts of Section 1028A are "susceptible to multiple reasonable readings" it defines "a means of identification . . . broadly to include names"). Here, John Doe's forged signature, which when "used in conjunction with" John Doe's address, which was also on the Check, "identif[ies] a specific individual"—John Doe. 8 U.S.C. § 1028(d)(7)(A).[7] Therefore, a rational juror could find beyond a reasonable doubt that defendant used a means of identification.

---

[7] For avoidance of doubt, and as defendant concedes, "several courts have held use of a name or signature sufficiently specific to constitute a means of identification for purposes of 18 U.S.C. § 1028A." Mot. 11 (citing cases in the Ninth, Tenth, and Eleventh Circuits holding that a signature on a check is sufficient to constitute a means of identification); *see also* Opp'n 25. And while defendant cites *United States v. Mitchell*, 518 F.3d 230, 235 (4th Cir. 2008), for the proposition that the use of a name to cash a counterfeit check, without more, is legally insufficient to constitute a means of identification, he concedes that the facts here are distinguishable. Unlike in *Mitchell*, where the information on the defendant's false license was "too general to identify a specific person," 518 F.3d at 236, here "the name corresponded with an address of a specific individual." Mot. 11; *see Mitchell*, 518 F.3d at 235 ("[A] bare name may not be sufficiently unique—indeed, it is not likely to be sufficiently unique—to identify a specific person. That is the case here, as the undisputed evidence confirms."). Indeed, under *Mitchell*'s reasoning, John Doe's name and valid address, which in combination "could be used . . . to identify" John Doe, would constitute a means of identification. 518 F.3d at 236. Accordingly, defendant's argument that the evidence was insufficient for a reasonable juror to conclude that he used a means of identification is without merit.

### III. Crux of the Criminality

Having found that the evidence was sufficient for a rational juror to conclude that defendant knew that John Doe was a real person, and used John Doe's means of identification, the Court must determine whether the evidence was sufficient to establish that defendant's use of John Doe's means of identification was "at the crux of what [made his] conduct criminal." *Dubin*, 599 U.S. at 131.

Defendant highlights recent Supreme Court and Second Circuit decisions expressing "serious concern about the overuse of Section 1028A in cases outside its intended reach," arguing that his conduct does not fit the ordinary meaning of identity theft. Mot. 8 (citing *Dubin v. United States*, 599 U.S. 110 (2023) and *United States v. Omotayo*, 132 F.4th 181 (2d Cir. 2025)). Here, because the Check cleared despite Capital One's policy against third-party endorsements, defendant claims that "[t]he only possible inference . . . is that the payee information and endorsement on the back were entirely ignored." Mot. 10. Therefore, defendant concludes that John Doe's means of identification could not be the crux of criminality because the identity was "entirely superfluous" to his theft of government funds. Mot. 8. And because "Section 1028A has no 'attempt' provision," defendant argues, the fact that John Doe's identity was ignored is dispositive in this case. Mot. 10. Defendant says his crime was akin to stealing cash—a physical object. Reply 5. His conduct was therefore not similar to the conduct contemplated by the statute—stealing and/or misappropriating someone's identity. Accordingly, in defendant's view, "[t]his was theft, not identity theft." Mot. 8.

The government counters that defendant's use of John Doe's name was "a key mover in the criminality" of the offense because the "theft could not have been accomplished without using John Doe's name and identifying information on the Check."

Opp'n 22. The government distinguishes defendant's crime from those in which "the object of the theft is [a] physical item," asserting that here, the goal was to obtain proceeds owed to John Doe. Opp'n 22. Because defendant "present[ed] the Check to the bank and mobile deposit[ed] the Check using John Doe's name and forged signature," the government concludes that "the identity theft was at the heart of the offense and was designed to unlawfully obtain the proceeds from the Check." Opp'n 23. The government rejects the notion that Capital One's policy against third-party endorsements warrants acquittal because "[t]here is no indication from Zetocha-Tasto's testimony that any of John Doe's means of identification were ignored or did not matter." Opp'n 24.

And on the government's read, defendant used John Doe's identity even if John Doe's means of identification was ignored by Capital One. That is because Zetocha-Tasto testified that "a payor's bank verifies [mobile deposit] check[s] before releasing the funds to Capital One," which is—according to the government—a basis from which "a reasonable jury could infer that, had the Check not been addressed to John Doe as a legitimate payee, it would not have been processed by the U.S. Treasury, the funds would not have been released to Capital One, and the defendant would not have been able to access those funds." Opp'n 24.

Defendant responds that such an inference is not one based in common sense and experience but rather one that is "speculative" and "esoteric." Reply 6. Defendant says that proof that the Treasury examined the payee information on the Check, or expert testimony on banking practices in general, would be required for a jury to draw such an inference. Reply 6.

First, the evidence presented regarding Capital One's processing of the Check suggests that John Doe's name and address were, at best, ancillary to the success of his

predicate offense—theft of government funds. Indeed, the logical inference from Zetocha-Tasto's testimony on direct examination is that John Doe's means of identification could not have been a key mover in the commission of the predicate offense because Capital One has an explicit policy prohibiting the acceptance of checks with third party endorsements by mobile deposit.

Second, the government's argument that a reasonable juror could infer that the U.S. Treasury used John Doe's name and address to verify the check is insufficiently supported by the evidence and cannot be derived from common understanding and experience. Such a leap is not inference, it is speculation.

Finally, a review of post-*Dubin* cases suggests that a means of identification cannot be at the crux of criminality where it did nothing to ensure or even facilitate the success of the predicate offense.

On the facts established at trial, no reasonable juror could have concluded that the use of John Doe's name and address was the "crux" of what made defendant's conduct—theft of government funds—criminal. Indeed, it appears that the "key mover in the criminality" here was the very fact that John Doe's name and address were not used at all. Accordingly, defendant's conviction on Count Two was insufficiently supported by the evidence and a judgment of acquittal on that Count is warranted.

The Court provides a brief overview of the binding precedent in this Circuit and then proceeds to apply that precedent to the facts of this case.

*A. Dubin and Omotayo*

"*Dubin* is the seminal case on Section 1028A." *Omotayo,* 132 F.4th at 193. The defendant in *Dubin* overcharged Medicaid by exaggerating the qualifications of an employee and then seeking reimbursement at a falsely elevated rate. *Dubin*, 599 U.S. at

114. Because defendant included his patients' names and Medicaid reimbursement numbers in the fraudulent bills, the government charged him with, *inter alia*, aggravated identity theft under Section 1028A. *Id.* at 114–15.

The question in *Dubin* was whether the defendant "used" his patients' means of identification "in relation to" his healthcare fraud. *Id.* at 116–17. The government argued that the statute "cover[ed] any time another person's means of identification is employed in a way that facilitates" a predicated offense. *Id.* at 122. The Court disagreed with such a "boundless" interpretation, *id.* at 114, holding instead that that "identity theft has a focused meaning," *id.* at 122. [8]

Of particular concern to the Court were certain policy considerations, specifically the sweep of the government's interpretation and the sentencing consequences that would flow from that interpretation. *Id.* at 127–31. Construed broadly, the Court reasoned, Section 1028A would reach "[a] lawyer who rounds up her hours from 2.9 to 3 and bills her client electronically" as well as "a waiter who serves flank steak but charges for filet mignon using an electronic payment method." *Id.* at 112. Observing that these examples "do not sound like identity theft," the Court explained that, for the lawyer, "the [client's] name itself is not specifically a source of fraud; it only plays an ancillary role in the billing process," and, for the butcher, "[one] might say the filet mignon's identity was stolen, perhaps, but not the diner's." *Id.* at 123.

And that sweep matters, the Court elaborated, because Section 1028A "adds a 2-year mandatory prison sentence onto underlying offenses that do not impose a mandatory

8 At the outset, the Court observed that "[t]he Government ha[d], by its own admission, wielded § 1028A(a)(1) well beyond ordinary understandings of identity theft." *Dubin*, 599 U.S. at 115.

prison sentence of any kind." *Id.* at 127. Because the mandatory minimum "prevents sentencing judges from considering the severity of the offense, even if the amount of money involved was quite small or there are other mitigating factors," the Court concluded that Section 1028A should be read narrowly to "reflect the distinction between the aggravated identity theft crimes that Congress sought to distinguish for heightened punishment and other crimes." *Id.*

After examining Section 1028A's title, statutory structure, text, and sentencing considerations, the Court determined that the word "use" and the phrase "in relation to" took on precise definitions in the context of Section 1028A. In short, the Court held that Section 1028A requires "a targeted reading, where the means of identification is at the crux of the underlying criminality, not an ancillary feature of [the predicate offense]." *Id.* at 129.

First, the Court read the phrase "in relation to" as referring to "offenses built around what the defendant does with the means of identification in particular." *Id.* at 122. In other words, the Court rejected a "definition of 'in relation to' that just means facilitates or furthers the predicate offense in some way." *Id.* at 127, 131–32. Instead, the Court reasoned, "the means of identification specifically [must be] a key mover in the criminality." *Id.* at 122–23.

The Court adopted "a more targeted definition of [the word] 'uses'" as well. *Id.* at 123. To fall within the ambit of the statute, the Court clarified, a defendant must "use[] the means of identification itself to defraud or deceive." *Id.* The Court explained that when a means of identification is "used deceptively," the deception "goes to 'who' is involved, rather than just 'how' or 'when' services were provided." *Id.* Accordingly, the Court held that a defendant "'uses' another person's means of identification 'in relation to' a predicate offense when [that] use is at the crux of what makes the conduct criminal." *Id.* at 131.

The Second Circuit subsequently explained that *Dubin*'s "at the crux" test requires that (1) "the means of identification . . . [was] a key mover in the predicate crime," that is, it played some "integral role in the success of the scheme"; (2) "the means of identification itself was "used in a manner that was fraudulent or deceptive"; and (3) that fraudulent use was "at the locus of the criminal undertaking, rather than merely passive, passing, or ancillary employment in a crime." *Omotayo*, 132 F.4th at 194–95.

Thus, in *Omotayo* the Second Circuit reversed the defendant's aggravated identity theft conviction, reasoning that he could not have "used" a means of identification where he "never showed the [means of identification] to . . . any other person besides . . . [his] co-conspirator." 132 F.4th at 197. There, the defendant was part of a wire fraud conspiracy. *Id.* at 187. Certain members of the conspiracy would pose as the employees of a legitimate business and attempt to persuade actual employees of that business to issue payments to sham business bank accounts controlled by the conspirators. *Id.* at 187. Sometimes, however, banks would flag transfers as suspicious and freeze the accounts. *Id.* Obviously, when an account was frozen, the conspirators would lose the funds held therein. Attempting to mitigate this risk, certain members of the conspiracy concocted stories to tell bank employees who questioned the validity of the transfers. *Id.* The defendant's role was to prepare fraudulent invoices to help prevent banks from detecting fraudulent transfers. *Id.* He used names of real employees of the target business on these fraudulent invoices. *Id.* at 188–89.

At the defendant's trial, the parties agreed that none of the invoices that had been submitted into evidence were ever actually used to demonstrate the validity of any transfer. *Id.* at 189. Accordingly, "[the defendant's] possession and transfer . . . of the invoices

provided the sole basis for the government's aggravated identity theft charge against [him]." *Id.* at 190.

First, the Second Circuit rejected the premise that the defendant's identity theft conviction could have been premised on his "use" of the employee's names. *Id.* Because "the evidence at trial was that [the defendant] never showed the invoice to the bank or to any other person besides . . . the co-conspirator to whom [he] transferred the document," the Second Circuit reasoned that a rational juror could not "say that the invoice was 'used' without giving that term an unworkably broad meaning." *Id.* at 197. Such a reading "would render the words "possess" and "transfer" largely superfluous in the statute," the precise thing *Dubin* cautioned against. *Id.* at 197 (citing *Dubin*, 599 U.S. at 126).

Second, the court found that "no reasonable jury could conclude that [the defendant]'s possession or transfer of [the employee]'s name was 'at the crux' of the fraud" because "the invoice was not a central part of the conspirators' scheme." *Id.* at 198. Rather, the invoice was a contingency plan—indeed, for the charged transaction, the conspirators "never needed to show the relevant bank any documents at all." *Id.* Moreover, the court noted that "in this setting, it is not the invoice that must be 'at the crux' of the fraud, but the 'means of identification.'" *Id.* Because the primary purpose of the invoice was to persuade the bank that the vendor had performed services meriting a transfer, each invoice was complete regardless of whether the employee's name was on it or not. *Id.* ("[T]he primary purpose of the invoice was to persuade the bank, 'in case' it asked, that [the sham business] was the vendor that had performed work for [the legitimate company][,] meriting a transfer of $24,364.31. Each invoice was complete (payee, payor, service rendered, date, amount) even without [the employee]'s name."). *Id.*

The Second Circuit ultimately concluded that "[the defendant]'s possession and transfer of [the employee]'s name did not 'play a key role' in the fraud that 'warrants a 2-year mandatory minimum,'" *id.* at 203 (quoting *Dubin*, 599 U.S. at 129), because "[t]he invoices bearing [the employee]'s name were intended to serve as part of a contingency plan, and, indeed, although the . . . fraud came close to being accomplished, the invoices were never used." *Id.* Accordingly, the Second Circuit found that the government failed to meet its burden to establish that the defendant's transfer, possession, or use of the employee's name was at the crux of the wire fraud scheme. *Id.* at 199.

*B. Application*

As a threshold matter, this case is not *Omotayo*. Here, it is undisputed that John Doe's name was used in the most literal sense of the word. Mot. 10; *see* Opp'n 23; *Omotayo*, 132 F.4th at 197 ("[The defendant] never showed the invoice to the bank or to any other person besides . . . [his] co-conspirator."). And the evidence established that defendant possessed John Doe's means of identification. Thus, the question is whether any rational juror could find that the use and possession was "at the crux" of defendant's theft of government funds.[9] Because "*Dubin* teaches that being at the crux of the criminality requires more than facilitation of the [predicate] offense," *Omotayo*, 132 F.4th at 198, the answer must be no.

Here, there was insufficient evidence for any reasonable juror to conclude that *Dubin*'s "at the crux" test, as articulated by the Second Circuit in *Omotayo*, was met. First,

9 The government does not argue that defendant "transferred" John Doe's means of identification in violation of the statute. But even if it did, the analysis would be substantially similar—and the outcome would be the same—given the lack of evidence establishing that John Doe's name was relevant to the success of the predicate offense.

the government presented no direct evidence supporting the conclusion that "the means of identification . . . [was] a key mover in the predicate crime," or that it "played some integral role in the *success* of the scheme." *Omotayo*, 132 F.4th at 194 (emphasis added).[10] On the contrary, the evidence suggested that John Doe's name was irrelevant to the transaction.

Zetocha-Tasto testified that Capital One "do[es] not allow third-party endorsements" on check deposits unless they are made "at a branch with a teller" because the bank would want to "verify that [such a] check was signed over intentionally." June 1 Tr. 69:05–10. And she confirmed that the Check, which bore a third-party endorsement, was deposited "against Capital One policy." June 1 Tr. 73:18–19. Given the stated rationale of Capital One's policy, the fact that the Check was deposited with no issue cuts *against* any inference that John Doe's name, signature, and address were seen, reviewed, or considered by the bank. Put differently, it does not support, and rather contradicts, the conclusion that John Doe's means of identification was an "essential part of [defendant]'s criminal conduct," *United States v. Avenatti*, No. 22-1242, 2024 WL 959877, at *4 (2d Cir. Mar. 6, 2024), *cert. denied*, 145 S. Ct. 408, (2024), or that it was "particularly important," *United States v. Croft*, 87 F.4th 644, 649 (5th Cir. 2023), to the predicate criminal conduct—the deposit of the Check and withdrawal of its funds. *See also Omotayo*, 132 F.4th at 202 n.12 (collecting cases in which various Courts of Appeal have affirmed Section 1028A convictions where a defendant's deceptive use of another person's identity was "an

---

[10] As noted in the government's opposition, there was ample evidence at trial that defendant presented the Check to the bank and mobile deposited the Check using John Doe's name and forged signature. GX 1; GX 301; *see* Opp'n 23. That misses the point, however, because "it is not the [Check] that must be at the crux of the fraud, but the means of identification." *Omotayo*, 132 F.4th at 198.

essential part of the defendant's criminal conduct"); *see* June 2 Tr. 201:08–19 (instructing the jury on the elements of theft of government funds).[11]

Nor did circumstantial evidence support defendant's aggravated identity theft conviction. Contrary to the government's argument, the remainder of Zetocha-Tasto's testimony does not provide a basis from which a reasonable person could conclude that John Doe's means of identification played any role in the success of the scheme, much less an "integral" one. *Omotayo*, 132 F.4th at 194. Zetocha-Tasto testified that Capital One scans "information about the payor's bank," such as "the payor's account number," the "routing number," the "check number," and the "amount of payment [] indicated on the check." June 1 Tr. 98:10–24, 99:9-11. She said that Capital One then sends an image of the check "to the payor's bank to request the funds," and the payor's bank—here, the U.S. Treasury—"verifies the check and releases the funds." June 1 Tr. 99:12–20. From this, the government claims a reasonable juror could infer that, "had the Check not been addressed to John Doe as a legitimate payee, it would not have been processed by the U.S. Treasury, the funds would not have been released to Capital One, and the defendant would not have been able to access those funds." Opp'n. 24.

The government's argument is unavailing for several reasons. First, the only piece of evidence that even marginally suggests that John Doe's means of identification

[11] The jury instructions on the predicate crime, theft of government funds, were as follows: "To show the defendant stole or converted government funds, the Government must prove the following elements beyond a reasonable doubt. First, that the money or property described in the indictment belonged to the United States Government; Second, that the defendant stole or intentionally converted that property; Third, that the defendant acted knowingly and intentionally with the intent to deprive the Government of the use and benefit of its property; and Fourth, the value of the property was greater than $1,000." June 2 Tr. 201:8–19.

advanced the crime is Zetocha-Tasto's statement that the payor "verifies" a mobile deposited check before releasing the funds. *See* June 1 Tr. 99:15–17. She did not elaborate, in even the most general way, on what that verification process might entail. Nor did the government put forward additional evidence on this point. Indeed, the word "verify" is not defined as authenticating any particular piece of information but rather means to authenticate generally. *See* Black's Law Dictionary (12th ed. 2024) ("To prove to be true; to confirm or establish the truth or truthfulness of; to authenticate."). The Court can "easily imagine that the [payor's] bank would have overlooked [John Doe]'s name entirely, focusing on the other information contained in the document," *Omotayo*, 132 F.4th at 198, such as the payor's account number, routing number, and/or checking number.

Second, it is unclear how the internal verification procedures of any financial institution, let alone those of the U.S. Treasury Department, would fall within the lay juror's common sense and experience. Moreover, "[t]he process of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a deduction or conclusion which the jury is permitted to draw from facts which have been established by either direct or circumstantial evidence." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019).[12] As discussed above, the facts established by the evidence did not

---

[12] The government faults defendant for claiming that John Doe's means of identification "did not matter" to Capital One, citing a single, non-binding case that merely observed that "[t]here is no [] actual reliance requirement in the current case law." *United States v. Sheppard*, No. 22-cr-20290, 2024 WL 2815278, at *14 (S.D. Fla. June 3, 2024); *see* Opp'n 24 n.2. In *Sheppard*, the court explained that when "considering the relationship between the identity theft and the predicate offense, [it] asks whether the identity theft is 'at the heart of the deception,' or 'material to the predicate offense.'" *Id*. There, where "the fraud could also have been successful had [the] [d]efendant not appended [the victim]'s name, signature and information at the end of the form," *id*., at *13, the court concluded "[i]t [wa]s not," *id*., at *14. Similarly, here, in the presence of evidence that the Check was deposited in violation of Capital One's stated mobile deposit

provide a basis from which to infer that the payor bank verified any specific piece of information on the Check, let alone the means of identification.

Taken in the light most favorable to the government, the jury heard evidence (1) that Capital One accepted a check in violation of a policy specifically designed to prevent the mobile deposit of checks with third-party endorsements, (2) that Capital One scans various pieces of information about the payor's bank and sends an image of mobile deposit checks to the payor's bank, and (3) that the payor's bank "verifies" the check and releases the funds. None of these three pieces of evidence supports the proposition that John Doe's means of identification was a "key mover," *Omotayo*, 132 F.4th at 194; *Dubin*, 599 U.S. at 122–23, in defendant's theft of government funds, and one suggests the opposite. Accordingly, John Doe's "means of identification itself" was not "a key mover in the predicate crime," nor did it "play some integral role in the success of the scheme." *Omotayo*, 132 F.4th at 194. And because those are "requirements" under *Dubin*'s "'at the crux' test," *id.*, the government's failure to adduce sufficient evidence on this point is dispositive. There are, however, additional reasons that the evidence presented at trial was insufficient to convict defendant of aggravated identity theft.

The government did not, as it must under *Dubin*, show "more than a causal relationship," *Omotayo*, 132 F.4th at 194, between the defendant's use, transfer, or

policies, and in the absence of evidence that any other verification procedures involved John Doe's means of identification, a rational juror cannot conclude the identity theft was "at the heart of the deception or material to the predicate offense." *Id.* That is primarily because defendant's successful theft of the funds "did not hinge on [John Doe]'s identity," *id.*, but rather the fact that he deposited and withdrew money belonging to the U.S. Treasury to which he was not entitled. That conduct "occurred without the identity theft." *United States v. McDonald*, 166 F.4th 440, 447 (4th Cir. 2026).

possession of John Doe's means of identification and the commission of the predicate offense, *see id.* at 195 ("[R]egardless of which verb is at play, a 'means of identification' must do more than 'facilitate[ ] or further' the predicate offense[.]") (quoting *Dubin,* 599 U.S. at 127)). Far from being "at the locus of the criminal undertaking," the evidence suggested that John Doe's means of identification was used in a way that was, at most, "merely passive [and] passing." *Id.* While John Doe's name, address, and forged signature appeared on the check, no witness or other evidence established that the name, address, or signature was relevant to defendant's ability to steal the funds associated with the Check. Indeed, it would be a different analysis if there was evidence that defendant forged the Check with John Doe's name because he somehow knew the forgery was necessary to ultimately deposit and withdraw the funds, or if there were evidence that he attempted to deposit the check without a signature or using a different name, had been unsuccessful, forged John Doe's signature, and then succeeded. *See Avenatti*, 2024 WL 959877, at *4 (concluding that attorney violated Section 1028A where he forged his client's signature on a letter "for the purpose of wrongfully obtaining her money" after "his client's literary agent refused to allow the diversion unless the client authorized it").

But that was not the evidence that was presented at trial. Therefore, this case contrasts with those in which this Circuit has affirmed post-*Dubin* aggravated identity theft convictions because, in those cases, the court concluded that "the very nature of the scheme required the use of a person's identification." *United States v. De Los Santos*, No. 22-3164, 2024 WL 3041944, at *2 (2d Cir. June 18, 2024) ("[T]he cooperating witness explained that *in order to* fraudulently obtain cellphones, [the defendant] and other members of the scheme would use their victim's first and last name, address, date of birth, and their zip code.") (emphasis added); *see United States v. Cuomo*, 125 F.4th 354, 369

(2d Cir. 2025), *cert. denied*, 146 S. Ct. 146, 223 L. Ed. 2d 41 (2025) ("As cooperating witnesses testified, the entire process was about impersonating debtors . . . so that the states would *falsely recognize* [the defendant's] employees as the target debtors *and provide* [the defendant's company] restricted [] information meant only for those debtors.") (emphasis added); *United States v. Sayegh*, No. 24-2080-cr, 2025 WL 3188814, at *2 (2d Cir. Nov. 14, 2025) ("After [the defendant] presented [the victim] with the first fraudulent surety bond, one of [the victim]'s investors expressed concern that the signatory of that bond did not come up in searches of registered insurance brokers. *To placate this concern*, [the defendant] provided Smith with a new surety bond signed by "Mike Haffar." Consequently, [the defendant]'s unauthorized use of Mike Haffar's signature to reassure [the victim]'s investors was at the locus of the criminal undertaking and a but-for cause of its success.").[13] These cases undermine the conclusion that a means of identification can be at the locus of the predicate crime where it plays no role in the crime's success.

Here, the evidence established that defendant committed the crime of theft of government funds. He deposited a U.S. Treasury check and withdrew funds from that check, knowing the funds did not belong to him. But the evidence suggests that, very much like the employee's name in *Omotayo*, John Doe's means of identification played no role

---

[13] While it is true that "no language in [Section 1028A] suggests that someone must be deceived or harmed" for liability to attach, *Omotayo*, 132 F.4th at 204 (Sullivan, J., dissenting), it is similarly true that the foregoing cases strongly suggest that *Dubin*'s interpretation of the statute's "at the crux" requirement would (and should) be difficult to establish where the use, possession, or transfer of a means of identification is so divorced from the success of the predicate crime that a party is not deceived or harmed. And given that there is no statute criminalizing "attempted theft of government funds," the Court declines to opine on the open question as to whether Section 1028A applies to inchoate offenses generally. *See id.* at 205 & n.1

in the ultimate accomplishment of that theft. Even accepting that John Doe's "name could have been useful to the success of the scheme," *Omotayo*, 132 F.4th at 203, the foregoing discussion illustrates why that is not enough to establish it was a key mover in the success of the predicate offense. Based on the evidence presented at trial, defendant's use of John Doe's means of identification was somewhere on a spectrum of "passive, passing, or ancillary," *id.* at 195, to "entirely superfluous," Mot. 8. Accordingly, defendant was convicted of "something the ordinary user of the English language would not consider identity theft at all," *Omotayo*, 132 F.4th at 203, and acquittal on Count Two is warranted.

## CONCLUSION

For the foregoing reasons, no reasonable juror could have found the evidence sufficient to support defendant's conviction on Count Two, aggravated identity theft. Accordingly, defendant's motion for judgment of acquittal as to Count Two is GRANTED.

**SO ORDERED.**

*/s/ Natasha C. Merle*
NATASHA C. MERLE
United States District Judge

Dated: August 28, 2026
Brooklyn, New York